**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DONNA J. SCHWEIZER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **12 C 3239** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this appeal, Donna J. Schweizer seeks a review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her claims for Disability Insurance Benefits and Supplemental Security Income pursuant to 42 U.S.C. § 405(g). Schweizer moves for summary judgment asking the Court to reverse the Commissioner's decision to deny benefits, while the Commissioner opposes her motion and asks the Court to affirm the decision. For the reasons provided herein, the Court denies Schweizer's summary judgment motion, affirms the Commissioner's decision, and dismisses this lawsuit in its entirety.

## Background

### I.       Procedural History

On December 1, 2010, Schweizer applied for both Disability Insurance Benefits and Supplemental Security Income. Schweizer alleged that she became disabled on April 17, 2009, due to a condition resulting from a torn esophagus sustained during an endoscopy procedure. R. 174, 183. Schweizer's applications were denied. R. 91-95. She then requested reconsideration of the denial, but on August 16, 2011, that request was also denied. R. 96, 102.

At her request, SSA Administrative Law Judge Lee Lewin ("ALJ Lewin") held a hearing on December 6, 2011, to determine the merits of her claims. R. 31, 112, 116. Schweizer, who was represented by counsel, medical expert John Pollard, and vocational expert Stephen Davis testified at the hearing. R. 31.

On December 28, 2011, ALJ Lewin denied Schweizer's claims for Disability Insurance Benefits and Supplemental Security Income, finding that Schweizer was not disabled as required by the Social Security Act. R. 7-20.

On March 22, 2012, the SSA Appeals Council denied Schweizer's request for review. R. 5. Thus, ALJ Lewin's ruling became the SSA's final decision on the matter and is reviewable by the Court pursuant to 42 U.S.C. § 405(g). *See Pepper v. Colvin*, 712 F.3d 351, 361 (7th Cir. 2013).

## II.     Factual Background

### A.     Vocational Evidence

Schweizer was born on January 29, 1967, and was 44 years old at the time of the SSA hearing. R. 176. She is five feet eight inches tall, weighs around 194 pounds, and has a high school education. R. 34. She alleges a disability onset date of April 17, 2009, at which time she was 42 years old. R. 174, 183. Schweizer's alleged disability results from scar tissue and nerve damage to her throat that purportedly was caused by a small tear in her esophagus from an endoscopic procedure. R. 37. From February to November 2010, she made $26,000.00 while employed as a full-time automotive sales person at a car dealer making straight commission. R. 35-36.

**B.     Medical Evidence**

The medical evidence in the administrative record describes the onset of Schweizer's condition and the treatment she received.  On April 16, 2009, Schweizer underwent an upper endoscopy of her upper gastrointestinal tract.  R. 459.  On the day she underwent the endoscopy, Schweizer began experiencing a cough and a sore throat. R. 461.  Her symptoms prompted her to go to the emergency room, where Schweizer received a CT scan that showed that she had a small upper esophageal tear.[1]  R. 461.  She subsequently developed an infection, and she was hospitalized at Provena-St. Mary's Hospital in Kankakee, Illinois, for at least six days.  While she was at the hospital, Schweizer was intubated for respiratory support and suffered from high fevers and a chest infection.  R. 594.

Shortly thereafter, on May 6, 2009, Schweizer was examined by her primary doctor, Dr. Hashim Zaidi. R. 540.  Dr. Zaidi noted that Schweizer complained of moderate epigastric pain, a cough, and a constant sore throat.  R. 539.  He diagnosed her as having gastroesophogeal reflux, a persistent cough, and reflux esophagitis.  R. 540.  Dr. Zaidi authorized Schweizer to return to work as of May 11, 2009.  R. 575.

Schweizer sought further treatment from her ENT physician, Dr. Christopher Lombardo. On May 13, 2009, Dr. Lombardo examined Schweizer, who complained of chronic hoarseness, difficulty swallowing, and pain when swallowing.  R. 594.  According to Dr. Lombardo, Schweizer indicated she had intermittent fevers, a chronic cough, and fullness in the throat, especially in the left upper anterior throat at the level of the hyoid and sternal notch region.  R. 594-95.  Seven months later, on December 23, 2009, Schweizer returned to Dr. Lombardo, who observed that she was experiencing intermittent hoarseness that was stress-related, a sensation of

---

[1]     Subsequent gastrografin esophagrams failed to show evidence of a tear.  *See* Letter from Brian C. Sasso, D.O.  R. 593.

fullness in the throat, and some difficulty swallowing. R. 588. After examining Schweizer, Dr. Lombardo also noted that she had minimal to mild tenderness in her right neck muscles when touched. R. 589-90. He advised Schweizer to continue seeing her speech therapist. R. 590.

In June 2010, because Schweizer had complained of right neck pain, she underwent a magnetic resonance imaging report ("MRI") of her neck and cervical spine as well as bone scans. R. 582, 584. The bone scans were normal with minimal arthritic cervical change. R. 586. The MRI of her cervical spine showed no acute compression, some disc space narrowing and disc degeneration from C4-C5 through C6-7, and normal spinal cord size and signal. R. 584.

In September 2010, Schweizer saw another ENT physician, Dr. Rajeev Mehta, for her throat problems. R. 580. She stated that she was suffering from a constant sore throat, a raspy voice that became worse later in the day, right neck pain that felt like needles, and some neck stiffness when turning her head to the left. R. 580. She told Dr. Mehta that she was not taking any medication to alleviate those symptoms. R. 580. A month later, in October 2010, Dr. Mehta met with Schweizer to report the results of an ultrasound and an esophagram of her esophagus. R. 578. Dr. Mehta told her that her esophagus was normal, with the exception of a small bleb, or mucous change, which had questionable significance. *Id.*

On October 28, 2010, Schweizer began seeing a neurologist, Dr. Daniel Orozco, to treat her throat symptoms. R. 522, 520. She complained of sharp pains on the right side of her throat throughout the day, difficulty in swallowing, and intermittent problems with her vocal cords that caused hoarseness. R. 522. Schweizer told Dr. Orozco that she had been treated with different medications that had not worked well, including Dilantin, which did little to alleviate the pain. R. 523. Dr. Orozco prescribed the liquid form of Neurontin. R. 524. During a follow-up visit on November 18, 2010, Dr. Orozco diagnosed Schweizer with glossopharyngeal neuralgia. R.

521.  He noted that her voice was hoarse and that the liquid form of Neurontin provided her with temporary relief of her symptoms.  R. 520.  Dr. Orozco instructed her to return in four months.  R. 521.

After Schweizer applied for disability benefits, the Illinois Bureau of Disability Determination Services selected Dr. Sarat Yalamanchili to perform a physical examination.  The agency also asked Dr. James Madison to perform a consultative physical Residual Functional Capacity ("RFC") Assessment based on the medical evidence in the record.  R. 636, 642-49.  Additionally, the agency selected Erwin Baukus, Ph.D., to conduct a mental examination of Schweizer, and Joseph Mehr, Ph.D., to perform a consultative mental RFC.  R. 652, 679-82.[2]

Dr. Yalamanchili conducted a physical examination of Schweizer on February 22, 2011.  Based upon the forty minute examination, he found her speech to be normal.  R. 636-37.  Dr. Yalamanchili also concluded that her cervical spine was normal and that the motion of any spinal segment or any joint in the upper extremities was not limited.  R. 638.  Dr. Yalamanchili noted, however, that Schweizer appeared to be in discomfort during the range of motion test on her cervical spine and upper extremities.  R. 638.  He diagnosed Schweizer as having glossopharyngeal neuralgia, difficulty swallowing, esophageal tear in 2009, and intermittent loss of voice.  R. 640.

Dr. Madison reviewed the medical evidence and provided a consultative physical RFC assessment on March 2, 2011.  R. 642-49.  He concluded that Schweizer did not have any communicative, manipulative, visual, or environmental limitations.   R. 645-46. He also determined that Schweizer could lift twenty pounds occasionally and ten pounds frequently; sit, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; perform

---

[2]     A physical or mental RFC assessment determines the most work a claimant can perform taking into consideration her or his physical or mental impairments.  20 C.F.R. § 416.945.

unlimited pushing and/or pulling; occasionally climb stairs; occasionally balance; and was unable to climb ladders/ropes/scaffolds.  R. 642-49.

Dr. Madison also determined that Schweizer's self-reported, symptom-related limitations were only partially credible given her medical history.  R. 647.  He found her claims credible to the extent that she had had a treatment history for glossopharyngeal neuralgia.  R. 647.  But he pointed to inconsistencies in the medical evidence that undermined her credibility in certain respects.  For example, although Schweizer reported difficulty in swallowing, she had gained weight over the last few months.  R. 647.  Further, while she complained that she was unable to bend her head down, Dr. Yalamanchili had noted that she only had a minor decrease in the range of motion in her cervical spine.  R. 647.  Schweizer claimed to experience throat pain and loss of voice after speaking for five to ten minutes, but Dr. Yalamanchili had observed that her speech was normal during the forty-minute examination.   R. 646-47.  Finally, although Schweizer stated that she could not lift anything, could only walk ten feet, and had difficulty reaching, climbing, and kneeling, Dr. Yalamanchili had reported she had normal strength, reflexes, sensations, and gait.  R. 647.

Dr. Baukus conducted a mental examination of Schweizer on March 9, 2011.  He noted that the volume of her speech was a bit low, but otherwise her speech was normal with respect to articulation, grammar, syntax, and vocabulary.  R. 652-53.  He diagnosed her as having chronic pain disorder with both psychological factors (depression and anxiety) and a general medical condition.  R. 655.

On March 25, 2011, Dr. Mehr reviewed the medical evidence and provided a consultative mental RFC.  R. 679-82.  He determined that Schweizer had the cognitive, psychological, social, and functional capacity to perform simple work of a routine and repetitive basis.  R. 681.

### C.    The December 6, 2011, Hearing Testimony

#### 1.    Donna Schweizer's Testimony

At the hearing, Schweizer testified that her neurologist had diagnosed her with glossopharyngeal neuralgia, *i.e.*, pain caused by the cranial nerve that goes to the throat. R. 39, 66. Glossopharyngeal neuralgia makes it difficult for Schweizer to talk. R. 38. She testified that she can normally talk for five to ten minutes before she starts to cough and has severe pain that feels like strep throat for about half an hour to an hour. R. 39. On a scale of one to ten, Schweizer rated the pain at about an eight. R. 41. She testified that her throat pain increases when she talks and that her throat is less painful when she does not talk loudly. R. 41, 60. Schweizer stated that she speaks anyways and works through the pain because she "hate[s] just sitting there." R. 60. However, she explained, when she speaks for a long time, she starts coughing and loses her voice for a while. R. 60. When asked whether she experienced throat pain during the hearing, Schweizer stated that even during the hearing she experienced throbbing, shooting pain that felt like knives stabbing her in the throat. R. 44.

Schweizer also explained how her throat condition affected her other activities. For example, she testified that engaging in more-than-normal activity made her throat swollen. R. 38-39. She added that turning her head to her right side was difficult and turning to her left side was feasible to some extent. R. 44. Schweizer also stated that reaching her arm out in any direction caused throat pain. R. 44-45. Walking and swallowing also trigger her throat pain. R. 59. Schweizer testified that, other than the physical symptoms of her throat condition, she is not experiencing any other physical problems with any other part of her body. R. 37.

Schweizer also described her daily activities. She stated that she slept about four to five hours per night, but at times would have trouble sleeping because it was hard to breathe when

lying on her side.  R. 45.  She dressed herself, showered by herself, wrote, typed, opened doors, used telephones, picked up pencils, bent over slightly, climbed stairs a bit, read books, used a computer, and went to the store once or twice a week with her husband, who drove her.  R. 46.  However, she herself did not drive because she could not turn her head.  R. 35, 50.

Additionally, Schweizer stated that she could only stand for about ten minutes before her throat started to hurt, and as a result, she could not cook or prepare meals.  R. 46-47.  She also explained that she could only walk about ten or fifteen yards before her throat began to hurt.  R. 47.  Although she had back surgery in 2000, Schweizer stated that her SSA claim was not based on the injury to her lumbar spine.  R. 174, 183.  Schweizer agreed that she was able to follow instructions, remember things, concentrate on tasks at hand and finish them, and work with people.  R. 50.  She was not feeling anxious or depressed, she was not being treated for any mental or emotional problems, and she had never taken any medications for anxiety or depression.  R. 51.   Schweizer stated that she did not smoke cigarettes, drink alcohol, or use drugs.  R. 52.

According to Schweizer, she began seeing her neurologist, Dr. Orozco, in 2010, and continued to see him once every three months.  R. 39-40.  Between August 2010 and November 2010, Dr. Orozco prescribed Neurontin that, when taken consecutively with doses of Ibuprofen, was more helpful than over-the-counter pain medication to alleviate her pain.  R. 43, 55-56, 58.  However, Schweizer testified that she discontinued taking Neurontin in November 2010 because she could no longer afford it due to lack of income.  R. 43, 55-56, 58.  Schweizer explained that, although she had attended forty two sessions of voice therapy so that she could improve her voice and speak without pain, her doctors said that the only thing that can help her now is

medication. R. 53-54. Schweizer added that she currently was taking Tylenol and Ibuprofen, but they did not really help to alleviate her pain. R. 14-15.

Schweizer also testified that Dr. Zaidi, who has been her primary doctor since she was 29 years old, has treated her throat condition, and she sees him twice a year. R. 40. In 2010, Dr. Zaidi wanted her to attempt to return to work. R. 57. She returned to work from February to November 2010 and earned $26,000.00 in straight commissions during that time period. R. 8, 35, 57. But in November 2010, her throat pain worsened, and she did not want to take additional doses of Neurontin because it made her dizzy and light-headed.[3] R. 58. She stopped working in November 2010. R. 36.

## 2. Medical Expert Dr. John Pollard's Testimony

Dr. John Pollard testified at the hearing as a neutral medical expert. To arrive at his opinions, he reviewed the complete medical evidence, including the records of Schweizer's treating physicians and their conclusions. R. 63-70. Dr. Pollard stated that Schweizer's symptoms were consistent with glossopharyngeal neuralgia. R. 65. He noted one contradictory indication in the medical evidence: an otolaryngologist had stated that Schweizer showed dysphonia, or tension in the vocal chords, which could be caused by anxiety rather than glossopharyngeal neuralgia. R. 65.

According to Dr. Pollard, the only functional limitation from Schweizer's condition was related to talking. R. 66. He concluded that the condition would be a severe impairment with regard to certain voice-dependent occupations, but would not be a severe impairment as to non-voice-dependent occupations. R. 63-64. Dr. Pollard also concluded that any back condition related to Schweizer's lumbar spine fusion surgery in 2000 was not a severe impairment. R. 64.

---

[3] Dr. Orozco, however, noted that Schweizer reported no difficulties or side effects from the liquid Neurontin. *See* R.17 (citing R. 664, 693).

Furthermore, Dr. Pollard determined that Schweizer's continued pain would not cause any functional limitations. R. 66. He pointed to Dr. Orozco's notation that Schweizer's pain was partially alleviated by liquid Neurontin. R. 67. Dr. Pollard also noted that Schweizer had discontinued taking the medication due to the expense. R. 67.

Based on his review of the medical evidence and his observation of Schweizer's testimony at the hearing itself, Dr. Pollard opined that Schweizer was able to produce speech that could be heard, understood, and sustained. R. 69-70. Given the medical records, Dr. Pollard disagreed with the conclusions of Drs. Orozco and Zaidi that Schweizer could not produce speech that could be heard, understood, and sustained. R. 70.

### 3. Vocational Expert Stephen Davis's Testimony

Stephen Davis testified at the hearing as a Vocational Expert ("VE"). The ALJ asked Davis several questions involving a hypothetical person, who was Schweizer's age with the same education and work history, intermittent voice loss, and restrictions for occasional reaching. (R. 73, 642-49.)

First, the ALJ asked the VE whether a hypothetical person limited to light work, who was (1) able to stand or walk a total of about six hours of an eight-hour work day, (2) able to frequently lift ten pounds, (3) able to occasionally lift twenty pounds, (4) able to occasionally climb ramps and stairs and balance, (5) incapable of climbing ladders, ropes or scaffolds, and (6) limited to simple, routine and repetitive work with simple instructions, would be able to perform the tasks that Schweizer had performed in her prior jobs. R. 73. Davis answered "no." R. 73. The ALJ then asked Davis whether there was other work in the economy that such a hypothetical person, who was restricted to light-duty work with the above restrictions, could perform. Davis replied that such a person could be employed as a bench worker and that 47,250 bench worker

positions were available in Illinois.  R. 74-75.   He also testified that such a person could work as an assembler of electrical equipment and that 2,325 positions were available in Illinois.  R. 74-75.  Further, the ALJ asked Davis whether there was other work in the economy that such a hypothetical person, who was restricted to sedentary work with the above restrictions, could perform.  Davis replied that such a person could obtain work as an assembler, for which 67,150 positions were available in Illinois, or as a surveillance system monitor, for which 6,300 positions were available in Illinois.  R. 74-75.

Second, the ALJ asked Davis whether a hypothetical person limited to light work, who could:  (1) stand or walk a total of about six hours of an eight-hour work day, (2) frequently lift ten pounds, (3) occasionally lift twenty pounds, (4) occasionally climb ramps and stairs and balance, (5) never climb ladders, ropes or scaffolds, (6) do work limited to simple, routine and repetitive tasks with simple instructions, and (7) *occasionally speak*, would be able to perform Schweizer's past work.  R. 74 (emphasis added).  Davis replied that such a person would not be able to perform Schweizer's past work.  R. 75.  Davis explained, however, that the same jobs for light work and sedentary work he described with regard to the ALJ's first hypothetical would be available to the person in the ALJ's second hypothetical.  R. 75.

Third, the ALJ inquired as to whether a hypothetical person limited to sedentary work, who could (1) sit a total of about six hours of an eight-hour work day with a sit/stand option, (2) lift a maximum of ten pounds, (3) occasionally lift twenty pounds, (4) do work limited to simple, routine and repetitive tasks with simple instructions, (5) *occasionally bend*, (6) *occasionally reach in all directions*, (7) *occasionally speak*, and (8) *occasionally rotate the head left and right*, would be able to perform Schweizer's past work.  R. 75 (emphasis added).  Davis replied that such a person would not be able to perform Schweizer's past work.  Davis added, however,

that such a person would be able to perform the following jobs in Illinois: 6,300 jobs as a surveillance system monitor; 34,000 jobs as a sedentary table worker; 34,000 jobs as a laminator; and 4,080 jobs as a coater working with brake linings. R. 75-77.

Fourth, the ALJ asked the VE whether a hypothetical person, who could (1) sit for less than a total of two hours in an eight-hour day, (2) stand or walk up to a total of two hours of an eight-hour day, and (3) never bend, reach, kneel, crouch, or climb, but would need breaks at will throughout the eight-hour day, would be employable. R. 77. The VE replied that there are no full-time jobs for a person who could only sit for two hours and stand and walk for up to two hours. R. 77.

## III. The ALJ's Decision

Although Schweizer claimed that her onset of disability started on April 17, 2009, the ALJ found that Schweizer had engaged in substantial gainful activity from February 2010 through November 3, 2010. R 12. The ALJ noted, however, that Schweizer had not engaged in substantial gainful activity from approximately November 4, 2010, to the time of the hearing and focused his findings on that time period. R. 13.

Next, the ALJ found that Schweizer had the severe impairments of "glossopharyngeal neuralgia and neck impairment/pain." R. 13. However, the ALJ found that neither of these impairments, alone or in combination, qualified as one of the impairments listed at 20 C.F.R. § 404, Subpart P, App. 1. R. 14. The ALJ explained that he carefully considered the opinions of Drs. Zaidi and Orozco, but gave them little weight because they were conclusory in nature and contradicted by evidence in Schweizer's own medical records. R. 14. *See* infra Analysis, Section II.

In addition, the ALJ assessed Schweizer's RFC. The ALJ concluded that, although the objective medical evidence showed that Schweizer's impairments could reasonably be expected to cause at least some of her symptoms, her description of the intensity, persistence, and limiting effects of her symptoms were not credible and inconsistent with the physical RFC assessment and her treating physicians' notes. R. 16. He thus concluded that, overall, the record did not support the degree of limitation alleged by Schweizer. There was no indication in her medical records that Schweizer was unable to speak effectively, that she had brought someone to communicate for her, or that she needed to write her responses to her doctors due to her intermittent loss of voice. R. 17. The ALJ observed that, at the hearing, Schweizer stated that her voice was almost gone, and yet her voice remained understandable at that point and throughout the entire hearing. R. 17. Although her voice may have been hoarse, its volume and clarity persisted, despite the vocal demands of testifying at a hearing. R. 17. The ALJ also emphasized that, although Schweizer testified that she could speak for only five to ten minutes before losing her voice, she answered questions for thirty-five minutes during the hearing and for one hour during her prior psychological examination with Dr. Baukus without losing her voice. R. 17.

Based on the medical evidence and hearing testimony, as well as Schweizer's age, education, and work experience, the ALJ determined that Schweizer had the RFC to perform sedentary work and was able to (1) sit a total of about six hours of an eight-hour work day with a sit/stand option, (2) lift a maximum of ten pounds, (3) occasionally lift twenty pounds, (4) do work limited to simple, routine and repetitive tasks with simple instructions, (5) occasionally bend, (6) occasionally reach in all directions, (7) occasionally speak, and (8) occasionally rotate her head left and right. Given this assessment, and relying on Davis's testimony, the ALJ found

that Schweizer was unable to perform the work she had done in the past. R. 18-19. However, based upon Davis's testimony regarding the number of jobs available for a person with limitations similar to those experienced by Schweizer, the ALJ concluded that Schweizer would be able to perform other jobs that exist in significant numbers in the national economy, and thus held that she was not disabled as defined under the Social Security Act. R. 19-20.

## Legal Standards

### I.     Standard of Review

A court's review of the Commissioner's decision is limited to examining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the ALJ's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). A court reviews the ALJ's legal conclusions *de novo* and factual determinations deferentially. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). "Substantial evidence" means "more than a mere scintilla" of evidence and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "[T]he ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). A court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

Although the ALJ is not required to address "every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind h[is] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). The ALJ "must build an accurate and logical bridge from the evidence to his conclusion," *Clifford v. Apfel*, 227 F.3d 863,

872 (7th Cir. 2000), and must minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review," *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

## II.     Disability Standard

Under the Social Security Act, a person is disabled if she or he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). To determine whether a claimant is disabled, the ALJ considers the following five questions in order. First, is the claimant presently unemployed? Second, does the claimant have a severe impairment? Third, does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? Fourth, is the claimant unable to perform her former occupation? Fifth, is the claimant unable to perform any other work? *See* 20 C.F.R. § 416.920(a)(4).

If the answer is "yes" at either step three or step five, then the claimant is considered disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). If the answer is "no" at any step, other than at step three, the claimant is not disabled. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* If the claimant establishes that she cannot perform past work at step four, then the burden then shifts to the Commissioner to show that the claimant is able to engage in other work existing in significant numbers in the national economy. *Id.*

<u>Analysis</u>

Focusing on the loss of her voice, Schweizer argues that the Commissioner's decision should be reversed because the ALJ applied Listing 2.09 incorrectly, improperly assessed Schweizer's credibility, and did not give deference to the opinions of Schweizer's treating physicians. The Commissioner opposes each of these assertions.

**I.      The ALJ's Application of Listing 2.09**

As an initial matter, Schweizer contends that the ALJ applied Listing 2.09 incorrectly. Listing 2.09, entitled "Loss of Speech," defines the qualifying disability condition as: "Organic loss of speech due to any cause with inability to produce by any means speech which can be heard, understood, and sustained." 20 C.F.R. § 404, Subpart P, App. 1, Listing 2.09. Social Security Ruling 82-57 ("Ruling 82-57") elaborates upon this definition:

> Three attributes of speech pertinent to the evaluation of speech proficiency [under Listing 2.09] are: (1) audibility – the ability to speak at a level sufficient to be heard; (2) intelligibility – the ability to articulate and to link the phonetic units of speech with sufficient accuracy to be understood; and (3) functional efficiency – the ability to produce and sustain a serviceably fast rate of speech output over a useful period of time. When at least one of these attributes is missing, overall speech function is not considered effective.

In addition, Ruling 82-57 further explains: "To speak effectively, an individual must be able to produce speech that can be heard, understood, and sustained well enough to permit useful communication in social and vocational settings."

Schweizer opines that the ALJ, by denying her claim based, in part, on the fact that she only lost her speech intermittently, incorrectly assumed that Listing 2.09 requires an absolute inability to produce speech. This is not the case. Rather than premising his ruling on the assumption that Listing 2.09 requires the absolute inability to speak, the ALJ affirmatively found

that Schweizer did not fall within the scope of Listing 2.09 because she was capable of producing speech that "can be heard, understood, and sustained" to a degree sufficient to permit communication in social and work environments. *See* 20 C.F.R. § 404, Subpart P, App. 1, Listing 2.09. This conclusion is sufficiently supported by the record.

First, the ALJ was in an advantageous position to observe firsthand at the hearing whether Schweizer was capable of producing speech that can be heard, understood, and sustained. He specifically found that "the claimant sustained her voice throughout the hearing," and that she "testified at one point during the hearing that her voice was almost gone, yet she remained understandable at that point and throughout the entire hearing." R. 15. The ALJ added that, "[w]hile hoarse, the volume and clarity of her voice persisted despite the vocal demands of an oral hearing." R. 15, 17. Although the medical expert did ask Schweizer to speak up at one point during the hearing, this alone is insufficient to refute the fact that the ALJ was able to hear and understand Schweizer when she spoke for thirty-five minutes at the hearing, R. 17, 35. *See Beauvoir v. Chater*, 104 F.3d 1432, 1434 (2nd Cir. 1997) (affirming ALJ's denial of benefits under Listing 2.09 because claimant provided audible, intelligible stage-whisper responses during an hour-long hearing, which showed that his speech was sustained).

Second, the ALJ also properly relied on Schweizer's past treatment history. For example, Schweizer's ENT physician, Dr. Lombardo, repeatedly noted that, although her voice was hoarse, she verbalized and communicated normally and appropriately. R. 15. Another one of Schweizer's ENT physicians, Dr. Mehta, observed that Schweizer was able to communicate. R. 15. In addition, although Drs. Zaidi and Orozco's treatment records indicated that Schweizer complained of hoarseness and moderate, intermittent, and dull throat discomfort, there was no indication that her speech could not be heard, understood, or sustained. R. 14-15. It was for this

reason that the ALJ gave little weight to their conclusory statements that Schweizer's glossopharyngeal neuralgia satisfied the listing requirement. R. 14-15. *See infra* Analysis, Section II. Additionally, the ALJ considered persuasive Dr. Pollard's neutral medical opinion that Schweizer's impairments did not satisfy the requirements of Listing 2.09. R. 15, 63, 69-70.

With respect to Schweizer's claim of intermittent speech loss, the ALJ noted that the condition had not impaired her ability to speak to her physicians: "None of the claimant's medical records suggests she was unable to communicate, that she had brought someone to communicate for her, or that she needed to write responses." R. 17. Furthermore, the ALJ also noted that Schweizer previously had "communicated throughout an hour-long psychological evaluation [performed by Dr. Baukus] with volume that was 'a bit low,' but with good articulation and no indication from the examiner that he was unable to hear or understand her or that she was unable to sustain her speech." R. 15 (citing R. 652-53).

After reviewing the record in its totality, the Court concludes that the ALJ correctly applied Listing 2.09 when he determined that the administrative record failed to support Schweizer's contention that she is unable to produce speech that can be heard, understood, and sustained.

## II.     The ALJ's Credibility Finding as to Schweizer

Next, Schweizer argues that the ALJ failed to justify his determination that parts of her testimony were incredible. In addition, she contends that the ALJ failed to point to parts of the administrative record that undermined her complaints with regard to steps three through five of the analysis.

The credibility of a claimant is considered in light of "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and

other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Social Security Ruling 96–7p. Because ALJs are in a unique position to observe a claimant's testimony, their credibility determinations are entitled to special deference. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013). Thus, the Court will not overturn an ALJ's credibility determination unless it is patently wrong.[4] *Id.* In other words, the ALJ's assessment stands as long as it has some support in the record. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). That said, an ALJ must give specific reasons for discrediting a claimant, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski v. Halter*, 245 F.3d 881, 887–88 (7th Cir. 2001)).

In this case, the ALJ provided an extensive analysis of the credibility of Schweizer's self-assessed limitations. R. 16-18. In so doing, he described the absence of objective medical evidence to support Schweizer's statements about the intensity and persistence of pain and other symptoms caused by her glossopharyngeal neuralgia. R. 16-17. The ALJ also pointed out that none of her medical records suggested she was unable to communicate with her physicians due to pain or intermittent loss of speech. R. 17. For instance, although Schweizer claimed that she had suffered from the severe disability since April 17, 2009, she had advised Dr. Zaidi in January 2010 that she was 100% better and desired to return to work as an automotive salesperson, which

---

[4]     Although Schweizer cites Ninth Circuit law in support of her argument that an ALJ is required to provide clear and convincing reasons for finding a claimant's testimony not credible, "[t]he Seventh Circuit has not adopted the Ninth Circuit's requirement that the ALJ must state clear and convincing reasons." *Adaire v. Colvin*, No. 11-3149, 2013 WL 6342993, at *23 (C.D. Ill. Nov. 26, 2013) (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)).

required speaking to customers with great frequency. R. 18. In fact, Schweizer returned to work in February 2010 and earned more in commissions that year than any other year since 2002. R. 18.

Furthermore, the ALJ explained that his own observation of Schweizer's speaking capabilities at the hearing, as well as the observations of other physicians, contradicted her own assessment of her limitations. R. 17. For example, although Schweizer testified that she could only talk for five to ten minutes before she started to cough and lost her voice altogether, she testified audibly and understandably at the hearing for thirty-five minutes straight, and also had spoken for sixty minutes during her psychological examination. R. 17. The ALJ also highlighted the fact that, although Schweizer testified at one point during the hearing that her voice was almost gone, she remained understandable at that point and remained so throughout the entire hearing. R. 17.

Given the deferential standard of review that applies to credibility assessments made by ALJs, the Court holds that ALJ Lewin's decision to afford minimal weight to Schweizer's testimony finds support in the record, and his decision sufficiently identifies the grounds for this determination. The ALJ observed Schweizer first-hand and is in the best position to gauge the credibility of her statements. Because there is no basis to believe that the ALJ's credibility determination is patently wrong, the Court will not overturn it.

## III. The ALJ's Consideration of the Treating Physicians

Lastly, Schweizer argues that the ALJ improperly rejected the assessments of limitations provided by her treating physicians, Drs. Zaidi and Orozco, as well as the examining physician, Dr. Yalamanchili. Normally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and

consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "However, 'while the treating physician's opinion is important, it is not the final word on a claimant's disability.'" *Books v. Chater*, 91 F.3d 842, 979 (7th Cir. 1996) (quoting *Reynolds v. Bowen*, 844 F.2d 451, 455 (7th Cir. 1988)). For example, "'[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Id.* (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)). Alternatively, "the claimant's regular physician may not appreciate how her patient's case compares to other similar cases," while a consulting physician's opinion "might have the advantages of both impartiality and expertise." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). And in those cases when a treating physician expresses his or her opinion by answering "yes," without further elaboration, in response to a question posed by a claimant's attorney, an ALJ may question the validity of that opinion. *See Dixon*, 270 F.3d at 1177. In any case, in weighing the evidence of a disability in the record, "[a]n ALJ must only 'minimally articulate his or her justification for rejecting or accepting'" it. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)).

To support her argument, Schweizer points to the responses given by her treating physicians, Drs. Zaidi and Orozco, to several questions posed in letters from Schweizer's attorney. The letters asked whether, in the opinion of the treating physician, Schweizer has: (1) "intermittent loss of voice"; (2) "any impairment that impacts her ability to produce speech that can be heard understood, or sustained"; (3) "any impairment that impacts her ability to sustain speech for a significant enough time to permit useful communication in a vocational setting"; or (4) "a voice that tends to become inaudible after she speaks for several minutes." Additionally, the letters also asked whether Schweizer's "intermittent loss of speech or impairment persisted

since at least" January 26, 2011 (as to Dr. Zaidi) or March 18, 2011 (as to Dr. Orozco). Finally, the letters requested that the doctor "provide any additional information that you believe would be relevant to the determination of whether Donna Schweizer meets Listing of Impairment 2.09 Loss of Speech. R. 702-03, 705-06.

In response to the questionnaire, Dr. Zaidi answered "yes -- sustained" as to the second question, "yes" to the remaining questions, and did not response to the sixth question. R. 702. Dr. Orozco answered "yes" to all the questions, and noted that "Donna has a severe case of glossopharyngeal neuralgia." R. 708.

After considering these responses, the ALJ explained that he gave little weight to them because they were conclusory in nature and neither Dr. Orozco nor Dr. Zaidi provided any explanations for their answers. Furthermore, the ALJ stated that, based upon his review of the record, these conclusions were not supported by the medical evidence or Drs. Zaidi's and Orozco's own treatment notes. R. 14.

As for Dr. Orozco, the ALJ found that Dr. Orozco's records were inconsistent with his affirmative answers because, other than mentioning that Schweizer was having difficulty speaking and was hoarse, there was no clinical indication anywhere in his notes that Schweizer's speech could not be heard or understood or that her voice would fade over time. R. 14. The ALJ also emphasized that the records made by other physicians who had treated Schweizer also failed to support Dr. Orozco's conclusions. The ALJ concluded, "Neither [Orozco's] office notes nor records of other physicians support the inability to produce speech that could be heard, understood, and sustained well enough to permit useful communication in social or vocational settings." R. 14. The Court finds that the ALJ's decision to give little weight to Dr. Orozco's responses to the letter sent by Schweizer's counsel is sufficiently supported in the record. *See*

*Johanson v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002) (holding that treating physician's opinion was not entitled to controlling weight because it was contradicted by other treating physicians).

Turning to Dr. Zaidi, the ALJ also found that Dr. Zaidi's "yes" answers did not warrant significant weight because "[h]is records, too, fail to support the conclusory/affirmative responses that the claimant satisfies the listing requirements." R. 14. As the ALJ points out, Dr. Zaidi released Schweizer to work in May 2009, after the onset of disability. R. 14. On January 18, 2010, he recommended that Schweizer discontinue non-steroidal anti-inflammatory drugs and aspirin. R. 14 (citing R. 622). In September 2010, Dr. Zaidi noted that Schweizer described her throat pain as moderate in intensity, intermittent, and dull. R. 14-15 (citing R. 616). In January 2011, Dr. Zaidi stated that her condition had remained unchanged. R. 15. And Dr. Zaidi's treatment notes from November 2011 made no mention of issues related to speaking or pain. R. 15. Accordingly, the ALJ's decision to give little weight to Dr. Zaidi's opinions also is sufficiently supported by the record.

Finally, according to Schweizer, the ALJ also ignored Dr. Yalamanchili's diagnosis of intermittent loss of voice. R. 640. But this mischaracterizes the record. In fact, rather than ignoring Dr. Yalamanchili's diagnoses of intermittent vocal loss, the ALJ took it into account when finding that Schweizer could only perform work that required occasional verbal communication. R. 17. Moreover, the ALJ's finding that Schweizer suffered from intermittent voice loss does not ineluctably require the ALJ to conclude that Schweizer suffered from an impairment that meets the requirements of Listing 2.09. As discussed above, the ALJ made factual determinations based on the administrative record that, despite Schweizer's intermittent

loss of voice, she was able to produce speech that could be heard, understood, and sustained to a sufficient degree to permit useful communication in social and work environments.[5]

What Schweizer is really arguing in this appeal is that the ALJ should have weighed the evidence differently. But when reviewing the Commissioner's denial of benefits, "[w]e do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). "Because the Commissioner is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact, this Court may not decide the facts anew." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (citation omitted).

In sum, the Court holds that Schweizer has failed to establish that the ALJ's legal conclusions were erroneous or that his factual findings are not based on substantial evidence in the record. Accordingly, the Court denies Schweizer's motion for summary judgment and affirms the Commissioner's decision.

---

[5]     Because ALJ Lewin did not find that Listing 2.09 required a complete loss of speech, the cases cited by Plaintiff are distinguishable. *See Woods v. Astrue*, No. CV 09-1547-OP, 2010 WL 147959, at *3 (C.D. Cal. Jan. 5, 2010); *Hajjar v. Astrue*, No. CV 08–7468–PLA, 2009 WL 3170097, at *5 (C.D. Cal. Sept. 30, 2009).

## **Conclusion**

For the foregoing reasons, Plaintiff Donna J. Schweizer's motion for summary judgment [12] is denied. The Commissioner's decision denying Schweizer's claims is affirmed. This case is hereby terminated.

**IT IS SO ORDERED.**                    **ENTERED:   10/3/14**

**The Honorable John Z. Lee**
**UNITED STATES DISTRICT JUDGE**